# COURT OF APPEALS
# DECISION
# DATED AND FILED

## May 24, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2021AP2046-CR**

Cir. Ct. No. 2008CF831

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JARROD J. JOHNSON,

DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Milwaukee County: MILTON L. CHILDS, SR., Judge. *Reversed and cause remanded with directions.*

Before Brash, C.J., Dugan and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Jarrod J. Johnson appeals an order entered by the trial court, in which the trial court granted a motion for his involuntary medication and treatment pursuant to WIS. STAT. § 971.17(3) (2019-20).[1]   We conclude that the factors in *Sell v. United States*, 539 U.S. 166 (2003), were erroneously applied when the trial court granted the State's motion.[2]   We also conclude that Johnson forfeited his argument that the reports[3] submitted by Johnson's treating psychiatrist, Dr. Odette Anderson, were erroneously considered as evidence.   We further conclude that the State failed to meet its burden to show that Johnson was dangerous and that Dr. Anderson provided Johnson with a reasonable explanation of the advantages and disadvantages of, and alternatives to, treatment with the psychotropic medication, Haloperidol.   Accordingly, we reverse the trial court's order, and we remand this matter with directions to deny the motion for involuntary medication and treatment.

## BACKGROUND

¶2    Johnson was charged with arson in 2008, after he reportedly set fire to his apartment because he believed the government had placed cameras inside his apartment and was filming and monitoring him.   Johnson was found not guilty

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] We refer to the motion as a motion by the State.   However, we recognize that the statute specifies that a motion of this type is one made by the "institution."   *See* WIS. STAT. § 971.17(3).   In this case, Dr. Odette Anderson filed this motion as a representative of the Mendota Mental Health Institute (MMHI), which is an institution operated by the State.

[3] Dr. Anderson submitted two documents dealing with the motion for involuntary medication—one dated September 13, 2021, and one dated October 27, 2021.   Dr. Anderson, counsel, and the trial court interchangeably refer to the documents as reports or letters.   For consistency and ease of reading, we refer to them as reports.

by reason of mental disease or defect (NGI) and committed for an indeterminate time, not to exceed twenty-five years. He was sent to a mental health facility for treatment from which Johnson was subsequently discharged on conditional release for the first time in 2011. His release was revoked in 2013, and Johnson was again placed at a mental health facility. Johnson was discharged on conditional release for a second time in April 2020. His second conditional release was revoked, and Johnson was placed at MMHI starting on May 11, 2021.

¶3 On September 13, 2021, MMHI, by Dr. Anderson, filed a motion for involuntary medication and treatment pursuant to WIS. STAT. § 971.17(3)(c). Dr. Anderson filed a corresponding report in which she described Johnson's treatment history, beginning from the time he was originally committed until the time of her report. She further described that, since the time of Johnson's return to MMHI, he had been declining recommendations to start medication, and Johnson's "symptoms and concerning behaviors have been increasing in frequency and severity." Dr. Anderson then provided several examples of Johnson's symptoms and concerning behaviors, including threatening letters that Johnson had written, aggressive and hostile interactions with MMHI staff, incidents involving Johnson throwing his lunch tray, and urinating on the walls, floor, and linens in his room. Ultimately, Dr. Anderson wrote, "Mr. Johnson has a chronic history of poor insight into the seriousness of his illness and the importance of treatment with psychotropic medication. He has had a history of declining his prescribed psychotropic medication." Dr. Anderson requested an order to involuntarily medicate Johnson because he "clearly has a disorder of cognition and impaired reality testing which grossly impairs his judgment." She also requested an order to involuntarily medicate Johnson because he "is not capable of repeating back information presented to him regarding the risk,

benefits, and alternatives to taking medication," and she stated that Johnson "is not capable of applying this information to his current situation."

¶4 The trial court set the motion for a hearing. When the hearing was rescheduled, Dr. Anderson sent a supplemental report to the trial court on October 27, 2021, in which she requested a new hearing date as a result of her increasing concerns over what she described as Johnson's deteriorating condition. In her report, Dr. Anderson explained that Johnson had begun to decline his meals, was not eating, and had been placed on suicide watch. Thus, she requested that the court reschedule the hearing for an earlier date so that she may be able to treat Johnson as soon as possible.

¶5 The trial court held a hearing on November 9, 2021, at which Dr. Anderson testified. Dr. Anderson testified that she began treating Johnson in August 2021 and they had been meeting "sometimes on a monthly basis" but "usually on a weekly or more frequent basis." In all, she estimated that she had met with Johnson approximately twenty times. Based on these meetings and a review of Johnson's treatment records, Dr. Anderson diagnosed Johnson with schizoaffective disorder, bipolar type.

¶6 She further testified that although she had prescribed a psychotropic medication—Haloperidol—to treat Johnson's condition,[4] he had not been on medication since he arrived back at MMHI in May. She testified that Johnson had refused to take the medication that she had prescribed. Dr. Anderson

---

[4] Dr. Anderson testified that Johnson had not been prescribed Haloperidol before, but he had been on other medications in the same class as Haloperidol that have been successful at treating his condition.

acknowledged that Johnson was currently being treated with certain alternatives to medication; however, she anticipated that Johnson would not demonstrate any improvement without taking a medication.

¶7     Some of the alternatives that Dr. Anderson described included using restraints and seclusion in order to control Johnson's behaviors and calm him down over an eighteen hour period in August 2021. She also described a method she called "show of force," in which staff make their presence known to a patient in order to de-escalate a situation before other methods, such as restraints or seclusion, would become necessary. She similarly described another method called "chill time" where staff would send a patient to his or her room to calm down and de-escalate a situation. She further testified that it had been months since Johnson had been restrained and secluded because staff were able to successfully intervene using "show of force" and "chill time" methods before Johnson's behavior escalated. Despite these methods, Dr. Anderson was of the opinion that there was not any other less intrusive means than medication to restore Johnson to where he was before, and she testified that Johnson "has required a lot of these types of interventions."

¶8     Overall, she described Johnson's mental state as declining, and she based her description of Johnson's mental state on Johnson's symptoms of psychosis and significant mood symptoms. She also testified that Johnson had recently been "declining oral intake" and, even though the situation had improved, that has been one of her primary concerns. She further acknowledged the threatening letters Johnson had written, but she testified that there was little risk that those letters posed a harm to others as a result of Johnson's current placement at MMHI.

5

¶9    At the conclusion of Dr. Anderson's testimony, both parties argued their respective positions under the *Sell* factors, and the trial court summarized the testimony from Dr. Anderson and granted the motion for involuntary medication.[5] In the amended order for placement filed after the hearing, the trial court additionally checked the box on the form that it found that the involuntary administration of medication was needed because Johnson was not competent to refuse medication or treatment as a result of his mental illness, which rendered him "incapable of expressing an understanding of the advantages and disadvantages of accepting psychotropic medication or treatment and the alternatives." Johnson now appeals.[6]

## DISCUSSION

### I.    Application of the *Sell* Factors to Johnson's Case

¶10    As a threshold matter, we address the application of the *Sell* factors to the motion for involuntary medication and treatment that were applied below. On appeal, the State argues that the *Sell* factors do not apply to a motion for involuntary medication and treatment within the context of a commitment following a NGI finding, but rather, the analysis in this case must proceed under

---

[5] We pause to note the lack of findings in the hearing transcript. As will be explained below, particularly in light of the detail described in *Outagamie County v. Melanie L.*, 2013 WI 67, 349 Wis. 2d 148, 833 N.W.2d 607, as necessary for the involuntary medication and treatment of a person, the trial court must do more than merely summarize the witness's testimony, and it must make specific factual findings and then explain why those facts meet the standard for involuntary medication.

[6] Johnson filed a motion for conditional release prior to the filing of the motion requesting an order for involuntary medication and treatment. Johnson withdrew his motion for conditional release at the conclusion of the hearing addressing the motion for involuntary medication and treatment. Johnson's motion for conditional release is not at issue in this appeal.

WIS. STAT. § 971.17(3). We agree, and we conclude that the application of the *Sell* factors to Johnson's case, as an individual under a commitment order entered under a finding of NGI, was in error.

¶11　Johnson was found not guilty by reason of mental disease or defect, and Johnson has been at MMHI as the subject of a commitment order entered under WIS. STAT. § 971.17(3). "After the person has been committed to an institution, it sometimes becomes necessary to make a decision about forcibly medicating him or her." *State v. Wood*, 2010 WI 17, ¶31, 323 Wis. 2d 321, 780 N.W.2d 63. When confronted with this situation, "[i]f the [S]tate proves by clear and convincing evidence that the committed person is not competent to refuse medication, the court may issue an order permitting the institution to administer medication and treatment without the person's consent." *Id.*; *see also* § 971.17(3)(b)-(c). The standard set forth in WIS. STAT. § 971.16(3) applies for determining if a committed person is not competent to refuse medication and treatment. *Wood*, 323 Wis. 2d 321, ¶31. The standard set forth in § 971.16(3) provides:

> The defendant is not competent to refuse medication or treatment if, because of mental illness, developmental disability, alcoholism or drug dependence, and after the advantages and disadvantages of and alternatives to accepting the particular medication or treatment have been explained to the defendant, one of the following is true:
>
> (a) The defendant is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.
>
> (b) The defendant is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment.

¶12 The ***Sell*** factors, while also applicable to situations involving involuntary medication, have clearly been stated to apply to proceedings in which a criminal defendant is involuntarily medicated for purposes of restoring the defendant's competency to proceed to trial.[7] "In ***Sell***, the United States Supreme Court addressed 'whether the Constitution permits the Government to administer antipsychotic drugs involuntarily to a mentally ill criminal defendant—in order to render that defendant competent to stand trial for serious, but nonviolent, crimes.'" ***State v. Fitzgerald***, 2019 WI 69, ¶13, 387 Wis. 2d 384, 929 N.W.2d 165 (citation omitted); *see also* ***State v. Green***, 2021 WI App 18, ¶14 n.9, 396 Wis. 2d 658, 957 N.W.2d 583, *aff'd in part*, 2022 WI 30, ___ N.W.2d ___.

¶13 Restoring Johnson to competency for trial is not the situation that is presented here. Instead, we address an order for involuntary medication requested in the context of a commitment order entered following a finding of NGI. Such a situation has its own procedures under WIS. STAT. § 971.17(3) that we have set forth above. *See* ***Wood***, 323 Wis. 2d 321, ¶29 ("WIS. STAT. § 971.17(3)(c), the provision at issue here, specifically applies to the involuntary medication of persons committed after being adjudged NGI for a crime."). Thus, the ***Sell*** factors were improperly applied below to evaluate the motion for involuntary medication given the context of Johnson's commitment at MMHI under § 971.17(3).

¶14 Moreover, "***Sell***'s standard was for the involuntary medication of a criminal defendant incompetent to stand trial," and there is a standard separate from ***Sell*** that applies to "different" purposes "related to the individual's

---

[7] Our supreme court described the four ***Sell*** factors in ***State v. Fitzgerald***, 2019 WI 69, ¶¶13-17, 387 Wis. 2d 384, 929 N.W.2d 165, and most recently in ***State v. Green***, 2022 WI 30, ¶¶15-16, ___ N.W.2d ___.

dangerousness, or purposes related to the individual's own interests where refusal to take drugs puts his [or her] health gravely at risk." ***Winnebago Cnty. v. C.S.***, 2020 WI 33, ¶28, 391 Wis. 2d 35, 940 N.W.2d 875 (citations omitted). The court further stated that the ***Sell*** "standard will permit involuntary administration of drugs solely for trial competence purposes in certain instances." ***Id.***, ¶27 (citation omitted). Thus, when confronted with an involuntary medication order outside of the context of restoring a defendant to competency, our supreme court concluded, "This case is not controlled by the ***Sell*** … factors. Rather, this case … involves involuntary medication of an inmate for a '*different* purpose' than competence to stand trial." ***Id.***, ¶30 (emphasis in original).

¶15     Johnson raises several arguments in response to the State's argument that ***Sell*** does not apply to his case. First, Johnson argues that a finding of incompetence alone is constitutionally insufficient to support an order for involuntary medication and the failure to apply the ***Sell*** factors violates his right to equal protection. We reject Johnson's arguments on these points as undeveloped and unsupported by legal authority. *See* ***State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992). Johnson also argues that judicial estoppel applies and requires us to reject the State's argument. Judicial estoppel is an equitable rule applied at the court's discretion, and we do not accept Johnson's invitation to apply it here, given that Johnson's argument requires us to ignore the law as it is correctly stated. *See* ***State v. English-Lancaster***, 2002 WI App 74, ¶18, 252 Wis. 2d 388, 642 N.W.2d 627.

¶16     Thus, having established the correct standard to apply under Wis. Stat. §§ 971.17(3) and 971.16(3), we next address the primary issue in this case, namely whether the State has met its burden to show that Johnson is not competent to refuse medication or treatment. The application of the facts to the standard is a

question of law that this court reviews independently. *See Outagamie Cnty. v. Melanie L.*, 2013 WI 67, ¶39, 349 Wis. 2d 148, 833 N.W.2d 607.

¶17 Furthermore, in analyzing whether Johnson is not competent to refuse medication or treatment, we note that we must bear in mind that "a person competent to make medical decisions has a 'significant' liberty interest in avoiding forced medication of psychotropic drugs." *Wood*, 323 Wis. 2d 321, ¶25. "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Melanie L.*, 349 Wis. 2d 148, ¶43 (citation omitted). Thus, we start from a place where "a person has the right to refuse medication unless a court determines that the person is incompetent to make such a decision." *See id.*, ¶53. "Moreover, an individual is presumed competent to refuse medication or treatment." *Id.*, ¶89.

## II. Dr. Anderson's Reports Are Properly Considered as Evidence

¶18 Johnson first argues that Dr. Anderson's two reports cannot be used to support the order for involuntary medication because the State never moved them into evidence. Thus, he argues that the evidence is limited to Dr. Anderson's testimony, and Dr. Anderson's testimony is insufficient to support the motion for involuntary medication and treatment. We reject this contention because Johnson failed, despite several opportunities, to object to the use of Dr. Anderson's reports below. *See State v. Huebner*, 2000 WI 59, ¶10, 235 Wis. 2d 486, 611 N.W.2d 727 ("Issues that are not preserved at the circuit court, even alleged constitutional errors, generally will not be considered on appeal."). A review of the record shows that the parties and the trial court clearly relied on the reports, and Johnson cannot now complain of their use without having raised the issue below.

¶19    During the hearing, the State questioned Dr. Anderson regarding the two reports that she wrote, and after confirming that she wrote them, the State asked the trial court to take "judicial notice" of her reports.[8]  After trial counsel stated that there was no objection, the trial court took judicial notice of the reports. Again, at the conclusion of Dr. Anderson's testimony, the State stated that it was relying on Dr. Anderson's testimony and what she filed in her two reports in support of its case, and trial counsel did not object.  Then, in rendering its oral ruling, the trial court noted that it had reviewed both of Dr. Anderson's reports in preparation for the hearing.  At no point did trial counsel object to the use of Dr. Anderson's reports during the proceedings below.  Indeed, trial counsel used the reports in cross-examining Dr. Anderson.

¶20    Consequently, we conclude that Johnson has forfeited any argument regarding the use of Dr. Anderson's reports as evidence to support the order, and we conclude that the evidence is not limited to Dr. Anderson's testimony.  *See State v. Caban*, 210 Wis. 2d 597, 608, 563 N.W.2d 501 (1997).  Thus, using both Dr. Anderson's reports and her testimony, we turn to the question of whether the State met its burden to prove by clear and convincing evidence that Johnson was not competent to refuse medication or treatment.    Even considering Dr. Anderson's reports, we conclude that it has not.

---

[8]  In highlighting this portion of the record, we note that one of Johnson's arguments is that Dr. Anderson's reports are not properly subject to judicial notice.  As a result of our conclusion, we do not address whether Dr. Anderson's reports are properly subject to judicial notice, and we simply provide this portion of the record as one of the several opportunities presented below that trial counsel had to object to the use of Dr. Anderson's reports.

11

### III. Dangerousness

¶21　First we address whether the State introduced sufficient evidence to support a finding that Johnson was dangerous.  Addressing the issue whether WIS. STAT. § 971.17(3) requires a finding of present dangerousness that serves as a basis for a court considering whether to issue an order for involuntary medication, our supreme court stated, "[W]e are satisfied that WIS. STAT. § 971.17(3), at a minimum, implicitly provides for such a finding [of dangerousness]."  *Wood*, 323 Wis. 2d 321, ¶34.  The court went on to state:

> We reach that conclusion based on the language of § 971.17(3)(a) that includes requirements for a determination of dangerousness at the time of commitment, the language of § 971.17(3)(c) requiring a doctor's examination and report when an institution seeks an order to medicate the patient involuntarily, and the language of § 971.17(4)(d) setting forth requirements for periodic reviews, which include a dangerousness determination.

*Id.*

¶22　The court explained that the "statutory language of WIS. STAT. § 971.17(3)(a) requires a finding that is the equivalent of one of dangerousness at the time of commitment."  *Id.*, ¶35.  It noted that the statute provides "[t]he court shall order institutional care if it finds by clear and convincing evidence that conditional release of the person would pose a significant risk of bodily harm to himself or herself or to others or of serious property damage."  *Id.* (quoting § 971.17(3)(a)).  Further, the court noted that if the institution files a motion for an order for involuntary medication, "the statute further requires a licensed physician to examine the individual and to issue a written report indicating that the person 'needs medication or treatment and that the person is not competent to refuse medication or treatment.'"  *Id.*, ¶36 (quoting § 971.17(3)(c)).  It then stated that

"[w]e are satisfied that such an assessment further encompasses an assessment of 'a significant risk.'" *Id.* Finally, the court explained that "the court must reassess dangerousness when the committed individual petitions for conditional release…." *Id.*, ¶37.

¶23 The court then concluded that "[t]hose requirements, taken together, create at least an implicit finding of dangerousness, if not an express finding, that serves as the basis for a court to consider granting a motion for an involuntary medication order." *Id.*, ¶38. Thus, to obtain an order to involuntarily medicate Johnson, the State was required to show, by clear and convincing evidence, that Johnson was dangerous to himself or others. We note that the State does not dispute that it had that burden on appeal. Rather, it argues that it met that burden. We disagree.

¶24 In its brief on appeal, the State's only reference to Johnson being dangerous is its statement that "[t]he State sought an involuntary medication order primarily because Johnson was trying to starve himself to death in institutional care." In her report[9] and her testimony, Dr. Anderson indicated that Johnson was dangerous because he was refusing to eat and had sent threatening letters to the mayor of Madison, a judge, and the clerk of courts. However, Dr. Anderson also acknowledged that Johnson was now taking one or two meals a day, plus some snacks from MMHI's canteen, and was no longer losing as much weight. She also acknowledged that Johnson had written threatening letters; however, she also

---

[9] In her initial report dated September 10, 2021, Dr. Anderson did not raise any issue about Johnson refusing to eat. It was not until she submitted her supplemental report dated October 27, 2021, that she mentions that she is concerned about Johnson not eating. In that report she states that Johnson "started to decline meals intermittently approximately ten days ago, and then, for approximately the past five days, has now been declining all meals."

13

testified that the letters were not a threat that he could implement based on his current placement at MMHI.

¶25 Moreover, Dr. Anderson testified that Johnson was being treated with alternatives to medication. As noted, some of the alternatives that Dr. Anderson described included a method she called "show of force," in which staff make their presence known to a patient in order to de-escalate a situation before other methods, such as restraints or seclusion, would become necessary. She similarly described another method called "chill time" where staff would send a patient to his or her room to calm down and de-escalate a situation. Although she testified that in August 2021, Johnson required three seclusion and restraint events over an eighteen hour period of time in order to calm him down, she also testified that it had been months since Johnson had been restrained and secluded because staff were able to successfully intervene using "show of force" and "chill time" methods before Johnson's behavior escalated.

¶26 We also note that the trial court did not make any factual findings to support a determination that Johnson was dangerous to himself or others. *See Langlade Cnty. v. D.J.W.*, 2020 WI 41, ¶¶44-45, 47, 391 Wis. 2d 231, 942 N.W.2d 277 (stating that dangerousness is a legal determination for which "specific factual findings" should be made). Rather, the court merely referred to the doctor's testimony stating:

> [Dr. Anderson] noted that there was a decline of oral intake but he has been improving since that time. And the positives are, definitely, that he's been, you know, eating more frequently than what he was before and not losing as much weight. But again, this was a concern with the facility, regards to his intake of food.

Thus, we conclude that the trial court did not make any factual findings to support a determination that Johnson was dangerous to himself or to others, and also failed to connect any factual findings to any legal determination that Johnson was dangerous. *See D.J.W.*, 391 Wis. 2d 231, ¶¶44-45, 47.

¶27 Given that Dr. Anderson recognized improvement in the danger Johnson posed to himself, the fact that the trial court made no finding that Johnson was dangerous to himself or anyone else, Johnson's inability to carry out a threat of harm to others in the letters he sent because of his placement in MMHI, and Dr. Anderson's testimony regarding the success of the alternative treatment methods used at MMHI, we thus conclude that the State failed to meet its burden to show by clear and convincing evidence that Johnson is dangerous to himself or others.

### IV. Dr. Anderson's Explanation of Haloperidol

¶28 Next, Johnson argues that the State failed to show that Dr. Anderson provided him with a reasonable explanation of Haloperidol and failed to explain "the advantages and disadvantages of and alternatives to accepting the particular medication or treatment" to Johnson. *See* WIS. STAT. § 971.16(3). The State argues that we should accept reasonable inferences that Dr. Anderson had explained the advantages and disadvantages of Haloperidol, and alternatives to it, to Johnson. We do not agree, and we conclude that the State failed to meet its

burden to show that Johnson was provided the explanation of Haloperidol to which he was entitled.[10]

¶29     Addressing identical statutory language regarding an order for involuntary medication entered within the context of WIS. STAT. § 51.61(1)(g)4.b., our supreme court stated:

> A person subject to a possible mental commitment or a possible involuntary medication order is entitled to receive from one or more medical professionals a reasonable explanation of proposed medication.  The explanation should include why a particular drug is being prescribed, what the advantages of the drug are expected to be, what side effects may be anticipated or are possible, and whether there are reasonable alternatives to the prescribed medication. The explanation should be timely, and, ideally, it should be periodically repeated and reinforced.  Medical professionals and other professionals should document the timing and frequency of their explanations so that, if necessary, they have documentary evidence to help establish this element in court.

*Melanie L.*, 349 Wis. 2d 148, ¶67.  Thus, we use the standard articulated by our supreme court in *Melanie L.* to evaluate Johnson's argument, and under this standard to provide Johnson a "reasonable explanation" of the proposed medication, we conclude that Dr. Anderson's reports and testimony fall short.

¶30     Dr. Anderson testified at the hearing that she prescribed Haloperidol for Johnson.  Yet, she did not explain why she chose Haloperidol when Johnson had been successfully treated with other medications.  She also failed to explain

---

[10] Because we conclude that the State failed to meet its burden to show that Johnson received an explanation of the advantages and disadvantages of and alternatives to Haloperidol, we do not reach the question of whether Johnson is "incapable of expressing an understanding" or "substantially incapable of applying" the advantages, disadvantages, or alternatives to Haloperidol as required by WIS. STAT. § 971.16(3)(a)-(b).

why the other methods currently being employed, such as show of force and chill time, are not reasonable alternatives to Haloperidol.

¶31 Furthermore, and most importantly, Dr. Anderson also failed to explain the details of the conversations she had with Johnson regarding Haloperidol, its advantages, its disadvantages, and any alternatives to the medication. Instead, she simply stated that she had conversations with Johnson generally:

> Q And is he able to understand the benefits to the psychotropic medications that are prescribed to him?
>
> A Not at this time, no.
>
> Q Okay. And have you personally, like, talked through those, the benefits and the pros and cons of taking the medications, with Mr. Johnson?
>
> A Yes.
>
> Q And what is his—had he—what has his reaction been, or what does he do with that information?
>
> A He says that he does not need to take any psychotropic medication because he is fine. He believes he is healthy. He does not believe that he has a mental illness, certainly not a significant one. He believes that his reports of being neglected by medical staff here at the institute, about being wronged by various staff members at the institute, are correct.

¶32 She further described, "And we do work with Mr. Johnson quite frequently, at least once per week, if not more, to provide psycho-education and encouragement and to repeat to him the benefits of allowing treatment. And that really has not effectively swayed him to date." At no point, however, did Dr. Anderson provide the details of the pros and cons and the psycho-education that were provided to Johnson as part of the reasonable explanation owed to Johnson in the face of being involuntarily medicated using Haloperidol.

17

¶33    We again note the lack of findings by the trial court regarding this issue. The court merely summarized Dr. Anderson's testimony, without making any factual findings or connecting any factual findings to the applicable standard. For example, the court stated that

> [Dr. Anderson] did have a conversation with [Johnson] and she feels that he is not able to understand the benefits of psychotropic meds. She went over the pros and cons of the medication with [Johnson], he feels that he doesn't need to take the meds, that he's fine and healthy, and she feels he really has no insight into his current diagnosis.

The trial court went on to say, "The med proposed, [Dr. Anderson] kind of went into details, in regards to the specific medication that is being asked for [] Johnson to take. I believe that he has not taken it in the past."

¶34    However, the court does not state what Dr. Anderson told Johnson about the advantages and disadvantages of Haloperidol, and the alternatives to it. In fact, Dr. Anderson did not tell the court what the advantages and disadvantages of Haloperidol are. She testified that she believed that Johnson had not taken Haloperidol before and, therefore, since he has not taken it, it is not known how he would respond to it. She also testified that she was not aware of what side effects, if any, Johnson had from medications that he took in the past and it may be true that he had no side effects from those medications. For example, she testified that Johnson had taken Lurasidone in the past and it worked. The question is then what did she tell Johnson during her discussions with him about Haloperidol and what did she tell him about alternatives such as Lurasidone that worked for him in the past.

¶35    "These hearings cannot be perfunctory under the law. Attention to detail is important." *Melanie L.*, 349 Wis. 2d 148, ¶94. When Dr. Anderson

18

responded to questioning in general terms, she should have been required to expound on her answers to provide the details required to show that Johnson was provided a reasonable explanation of Haloperidol.[11] *See id.*, ¶91. Thus, under the standard set forth in **Melanie L.**, we conclude that Dr. Anderson's general descriptions are insufficient, and we reject the State's arguments to accept, as reasonable inferences, that Dr. Anderson provided a reasonable explanation to Johnson of the advantages and disadvantages of, as well as alternatives to, Haloperidol. Accordingly, we conclude that the State has failed to meet its burden because it failed to show that Johnson was provided a reasonable explanation of Haloperidol.

## CONCLUSION

¶36    In sum, we conclude that the **Sell** factors were inappropriately applied to the motion for involuntary medication or treatment, and the motion

---

[11] In reaching our conclusion, we also note that we have had a previous occasion to recognize that Haldol, the brand name for Haloperidol, has several potentially severe side effects:

> Haldol certainly can cause side effects, including sedation, slurred speech, a tremor, a feeling of muscle restlessness that we refer to as akathisia, a phenomenon that is certainly like tremors but referred to as parkinsonism because it mimics the appearance of individuals who have Parkinson's disease. It has the potential to affect cardiac conduction and heart rhythm. It has an impact on what's called the QT interval, which is part of the electrocardiograph rhythm, and it can certainly have some metabolic side effects as well in terms of its impacts on weight gain and blood sugar.

**State v. Green**, 2021 WI App 18, ¶23, 396 Wis. 2d 658, 957 N.W.2d 583, *aff'd in part*, 2022 WI 30, ___ N.W.2d ___. The record here is silent as to whether any of these side effects were explained to Johnson, and given the substantial nature of these side effects and the applicable standard, we cannot ignore the record's silence on the details of the information provided to Johnson.

should be evaluated under WIS. STAT. §§ 971.17(3) and 971.16(3). We also conclude that Dr. Anderson's reports are properly considered as evidence in this case because Johnson forfeited his argument by failing to object to the use of Dr. Anderson's reports at the time of the hearing. Nevertheless, even considering the reports, we further conclude that the State failed to meet its burden to show that Johnson is not competent to refuse medication, both because it failed to prove that Johnson was dangerous and because it failed to prove that Johnson was given a reasonable explanation of the advantages, disadvantages, and alternatives to Haloperidol. Consequently, we reverse the order of the trial court, and we remand this matter with directions to vacate the order for involuntary medication and to deny the motion for involuntary medication.

*By the Court.*—Order reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.